■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL NICKERSON, Appellant.—Judgment of the Supreme Court, Bronx County (Bernard H. Jackson, J.), rendered June 21, 1989, convicting defendant, after a jury trial, of manslaughter in the second degree and criminal possession of a weapon in the fourth degree, and sentencing him to an indeterminate term of 3 to 9 years and a concurrent definite term of one year, respectively, is unanimously reversed, on the law, the facts, and as a matter of discretion in the interest

of justice, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused, pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30 day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

At about 10:00 P.M., on a cold night toward the end of December 1987, four young men met in a Bronx bar called the Golf Cafe. Kenneth Kirby, Patrick Culhane, his brother Joseph, and Lee Schram drank for about four hours and, at about 2:00 A.M., left to buy cocaine for their own use. There was testimony that the idea to buy the cocaine originated with Schram, although all four wanted it.

After Patrick Culhane and Lee Schram left the car and went to a bar on Webster Avenue in search of the narcotics, Patrick told Schram, "let's leave" but Schram demurred saying "the guy lives across the street, let's go across the street." The two then went across the four lane road to a large, two-family home where no lights were visible. Schram knocked on the door or rang the bell for quite some time with no answer. Patrick, who sat on a porch railing, suggested they leave but Schram refused and continued knocking. The front door opened and defendant appeared. Patrick could not see since the door opened outward blocking his view. Kirby and Joseph Culhane, seated in a car, could see defendant and Schram's back but could not see either man's hands, nor hear any conversation. Patrick testified that when Schram asked what he could get with $25, defendant "was pretty excited" saying it was 2:00 A.M. and that Schram had awakened the defendant's parents and must be crazy. Defendant told Schram to leave. Patrick Culhane testified Schram was "adamant", kept "pressing" defendant for cocaine and defendant said "do you want to die". Schram then lunged or dove into the vestibule and a brief struggle ensued. Kirby recalled seeing a "fight" with punching and shoving. He observed Schram grab around defendant's waist and Patrick come from behind the door and grab Schram, followed by the sound of a "pop". Kirby did not see either defendant or Schram with a gun. Patrick testified after he heard a "pop" he came around the door and observed Schram hanging onto defendant's waist. An "older man" was holding defendant who held a gun in his right hand (although Patrick was not positive that defendant was the individual with the weapon). Joseph Culhane saw a very brief struggle, during which no punches were thrown after which he heard a

shot but he never testified that he saw a gun. Patrick, with the aid of Joseph and Kirby, put Schram into their car and took him to Montefiore Hospital after seeing a bullet hole in Schram's shoulder.

Defendant had resided with his parents all his life at that address. He was living there that December with his parents, his brother, fiancee and their 4 year old son. He had worked for seven years at a neighborhood sporting goods store and after recently being laid off from the United Parcel Service had begun repairing cars. Defendant had never been convicted of any crime.

He testified he was awakened in the early morning hours by two people at the door. He asked the stranger at the door what he wanted—the man twice answered "what [he] could get for $25 or $28", the defendant twice asked him to leave saying he did not deal in drugs. The man persisted and then pushed his way into the vestibule. The man held a gun, defendant grabbed it with both hands and after a struggle wrested it from him. As the man continued to struggle with defendant, the gun went off and the man fell to the floor. Defendant did not recall pulling the trigger and did not intend to pull the trigger or shoot the man.

Milton Nickerson, defendant's 66-year old father, employed at the New York Stock Exchange for 35 years, testified the family had lived in the ground floor apartment for 27 years. He testified he did not see or hear a shot or the struggle in the vestibule.

We have set forth in detail some of the facts which appear salient to us. There are seriously disturbing aspects of this case which, in our opinion, warrant reversal in the interest of justice (CPL 470.15 [3] [c]).

Initially, we note that defendant claims the trial court's refusal to permit into evidence the opinion of the decedent's friend regarding the decedent's behavior on the night of his death as well as a history of fighting and also evidence of the decedent's "drug addiction" denied him a fair trial. Thus, Kenneth Kirby first told Joseph Culhane in the car as the fight began and then later to the police "I knew this was going to happen because [Schram] is prone to getting into fights". Further, Schram had apparently been discharged from a drug rehabilitation program only about one month prior to the night of the shooting and there was an indication that the institutionalization was a lengthy one. Evidence of a decedent's prior violent acts is admissible where the defendant

was actually aware of the violent acts committed by the decedent at the time of the homicide *(People v Miller,* 39 NY2d 543). Here, there was no evidence that the defendant had any prior knowledge of the decedent at all. Therefore, the evidence of decedent's prior drug addiction or of violent acts previously committed by him, was properly excluded by the trial court.

However, we note that this evidence highlights the extremely questionable showing upon which the jury convicted defendant of manslaughter in the second degree and criminal possession of a weapon in the fourth degree. After drinking for four hours, four men drove to a private house at 2:00 A.M. seeking cocaine. Although Patrick Culhane, who himself was "legally high" pleaded twice with the decedent Schram to leave, Schram kept knocking on the door or ringing the bell until he awoke defendant and his family. Defendant appeared at the door shirtless and barefooted. Neither Kirby nor Joseph Culhane saw him with a gun. Schram who was dressed for a cold December night wore many layers of clothing in which a gun could have been hidden easily. In any event, the decedent was asked to leave repeatedly but never retreated and in fact entered the vestibule of the defendant's home after being asked to leave. Significantly, not one prosecution witness saw the shooting.

Moreover, defendant had a good work record and had never been convicted of a crime. As noted, he resided with an extended family, including his parents, in the same house for over 20 years.

We concede that the evidence was legally sufficient. To conclude that "a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial * * * and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" *(People v Bleakley,* 69 NY2d 490, 495). However, although that test has been met, our duty remains to also review the evidence to determine whether the verdict is supported by the weight of the evidence. "If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict (CPL 470.20 [2])". *(Supra,* at 495.)

As we have noted previously "[W]e must guard against being capricious and whimsical, affirming when we feel like it, and reversing when we feel like it. A Judge 'is not a knight-

errant roaming at will in pursuit of his own ideal of beauty or of goodness' (Cardozo, Selected Writings, Nature of the Judicial Process, p 164, quoted in *People v Shepard*, 50 NY2d 640, 646). But we think we do not overstep the line when we exercise our 'interest of justice' powers on the basis of so fundamental a consideration as guilt or innocence." *(People v Kidd*, 76 AD2d 665, 667.)

Accordingly, we reverse defendant's conviction as against the weight of the evidence (CPL 470.15 [5]) and dismiss the indictment. Concur—Murphy, P. J., Carro, Ellerin and Asch, JJ.